ETHEL M. FOSTER, Admx., Defendant in Error, *vs.*
HOMER SHEPHERD, Plaintiff in Error.

*Opinion filed February 20, 1913—Rehearing denied April 3, 1913.*

1. TRESPASS—*when trespass vi et armis is a proper form of
action.*  Trespass *vi et armis* is a proper form of action to re-
cover damages for the death of the plaintiff's intestate, caused by
the direct and immediate force and violence of the defendant in
wrongfully shooting him.

2. HOMICIDE—*when defendant is not liable for shooting a sup-
posed burglar.*  One who in good faith shoots and kills another
believing it is necessary to prevent the commission of a burglary
upon his residence is not liable in damages to the estate of the
deceased, even though the supposed attempt at burglary was a
mere jest, provided the circumstances are such that other reason-
able men would have been alike mistaken as to the purposes of
the deceased.

3. SAME—*the doctrine of self-defense is applicable to an act in
defense of habitation.*  The doctrine of self-defense, which holds
that one threatened with danger may in good faith act upon ap-
pearances, and will not be liable for a mistake in the extent of
the danger if from all the facts and circumstances it can be seen
that other reasonable men would have believed a resort to self-
defense was necessary, is applicable to an act committed in de-
fense of habitation as well as one committed in defense of person.

4. SAME—*party may be justified in resorting to force though
it was not, in fact, necessary.*  Where a person is committing acts
in or about a dwelling which reasonably and in good faith are
believed by the occupant thereof to manifest a felonious intent
the latter may resort to force to repel the attack or prevent the
felony, and his act may be justifiable under the law of self-defense
even though it turns out that no felony was contemplated but the
only design was to frighten those in the dwelling.

5. SAME—*circumstances must be such as to excite the fears of
a reasonable person.*  In order that a person may be justified in
killing another in defense of his habitation, where his act is based
entirely upon appearances, the circumstances must be such as to
excite the fears of a reasonable person and the act must be the re-
sult of such reasonable fears.

6. SAME—*whether circumstances justified resort to violence is
a question for the jury.*  Whether the killing of one person by an-

other occurred under circumstances which justified the act under the doctrine of self-defense or was the result of some other motive is a question of fact to be determined by the jury, under proper instructions, from a consideration of the evidence.

7. EVIDENCE—*when a statement by deceased as to intention of staying all night at his mother's is not admissible.* A statement made by the deceased several hours before he was killed, that he intended to stay all night at his mother's house, is not admissible, there being no act connected with such statement which would make it properly a part of the *res gestæ.*

8. TRIAL—*when excluding testimony does not cure error in admitting it.* Error in admitting incompetent evidence is not cured by the action of the court in subsequently striking it out, where it is apparent from the conduct of counsel that they knew the evidence would have to be stricken out but secured its admission for the evident purpose of getting the benefit from the impression the evidence would make upon the minds of the jurors even though it should be immediately stricken out.

9. SAME—*it is not error for counsel to refer to facts in the case though they appeal to sympathy of jury.* It is not error for counsel, in arguing the case to the jury, to call their attention to facts in the case which they have a right to consider, even though a consideration thereof must appeal to their sympathy.

10. WITNESSES—*when defendant may testify in suit by administratrix.* Where the administratrix attempts to prove a statement made by the defendant to a third party as being an admission against his interest, the defendant has a right not only to deny making the statement, but also to prove such other parts of the conversation as tend to explain or destroy the admission.

11. CORONER'S VERDICT—*admissibility of coroner's verdict in a civil suit for damages.* In a civil suit for damages for the shooting of the plaintiff's intestate, so much of the coroner's verdict as states that the deceased was killed by a bullet from a gun in the hands of the defendant, "who in our opinion was justified in the act," is admissible as a necessary part of the verdict, but portions of the verdict finding mere evidentiary facts should be excluded.

VICKERS and FARMER, JJ., dissenting.

WRIT OF ERROR to the Appellate Court for the Third District;—heard in that court on appeal from the Circuit Court of Moultrie county; the Hon. W. G. COCHRAN, Judge, presiding.

EDWARD C. CRAIG, JOHN E. JENNINGS, and HENRY I. GREEN, for plaintiff in error.

E. E. WRIGHT, W. K. WHITFIELD, WHITLEY & FITZGERALD, and J. L. McLAUGHLIN, for defendant in error.

Mr. JUSTICE COOKE delivered the opinion of the court:

The Appellate Court for the Third District affirmed a judgment of the circuit court of Moultrie county against the plaintiff in error for $7750 in an action on the case brought by Ethel M. Foster, as administratrix of the estate of her deceased husband, Ralph Foster, to recover damages against plaintiff in error, Homer Shepherd, for wrongfully causing the death of her husband. The record has been brought to this court for further review by writ of *certiorari.*

The declaration contains seven counts. The first count charges plaintiff in error with an assault *vi et armis,* and alleges that on the 19th day of August, 1909, plaintiff in error did unlawfully shoot and discharge a pistol at, to and against defendant in error's intestate, and did then and there thereby shoot and kill the said Ralph Foster. The second, fourth and fifth counts also charge an unlawful killing of Ralph Foster, and differ from the first count only in that the assault in these counts is alleged to have been wanton, willful and malicious. The third, sixth and seventh counts allege an assault by negligently and carelessly firing the gun at deceased and thereby killing him. All of the counts of the declaration are in trespass *vi et armis,* and the qualifying words "negligently and carelessly," found in the third, sixth and seventh counts, and "wanton, willful and malicious," used in the second, fourth and fifth counts, are evidently intended to express the varying degrees of culpability that might be shown to exist by the evidence. All of the counts allege that the death of the defendant in

error's intestate was caused by the direct and immediate force and violence of the plaintiff in error in wrongfully shooting him, and for such an act trespass *vi et armis* or trespass on the case is the proper form of action.

At the close of the evidence for defendant in error, and again at the close of all the evidence, plaintiff in error entered a motion for a directed verdict, and the denial of this motion is among the rulings of the court assigned for error. As will be seen from what is said hereafter in this opinion, there was evidence tending to support the allegations of some of the counts of the declaration, and the motion for a directed verdict was properly denied.

Ralph Foster was a young man about twenty-nine years of age, and, excepting about three years' absence while working in Chicago, had resided during the whole of his lifetime in the village of Lovington, Illinois. Plaintiff in error was about the same age, and these two young men had grown up together, were schoolmates and had been closely associated all their lives. Plaintiff in error's wife was a first cousin of the deceased and their families were intimate and on friendly terms. Plaintiff in error was an official of the Shepherd National Bank, located at Lovington. The father of Ralph Foster had been a merchant in Lovington and had died a few years before the death of his son. The deceased at the time of his death was acting as trustee under the last will and testament of his father, and as such trustee was conducting the mercantile business left by his father. The store building in which this business was conducted was located at the north-east corner of the intersection of the streets known as State and Broadway. The residence of plaintiff in error was located at the north-west corner of the intersection of the streets known as State and Washington, three blocks west of the Foster store. Ralph Foster's residence was located across Washington street east from the residence of Homer Shepherd and about half a block north. The residence of the mother

of Ralph Foster was located one block north and one or one and one-half blocks west of the residence of plaintiff in error. About eleven o'clock on the night of August 19, 1909, the reports of three gun shots were heard by persons in the vicinity of the residence of plaintiff in error, and a few minutes thereafter the dead body of Ralph Foster was found lying on the sidewalk on the north side of State street, immediately south of the residence of Homer Shepherd. The body was lying on its back, with the feet about the middle of the sidewalk and extended towards the north-west, and the head lying south of the south line of the sidewalk and extended towards the south-east. Upon examination it was discovered that Foster had been shot in the back, the bullet entering just above the right shoulder-blade or scapula and about four inches to the right of the spinal column. It was later learned that the bullet had taken a downward course through the lungs and supposedly through the right ventricle of the heart, and was found located immediately underneath the skin four inches to the left of the navel.

Ralph Foster was last seen alive at about 10:30 o'clock that evening on Broadway street, near his store building. At the time the body was found it was discovered that the two lower buttons in the lapel of the trousers were unbuttoned and the trousers gaping. The theory of the plaintiff below (defendant in error here) is that the deceased left his store building and started to go to the residence of his mother to spend the night there, and while walking along the sidewalk south of plaintiff in error's home he stopped under a tree, with his back toward the south side of the Shepherd residence, to urinate, and was shot from the south window of the second-story west room of the Shepherd house and killed at the place where his body was found. Plaintiff in error does not deny the killing, but defends upon the theory that Foster had come across the street from his own home for the purpose of frightening him by

pretending to be a burglar, and that he fired the shots from the west window of his bed-room believing that deceased was a burglar in the act of committing a burglary upon his residence at the time, and that he acted in defense of his family and his property. Neither of these two theories is supported by the testimony of eye-witnesses, as of the three persons who knew the true facts concerning the killing, Ralph Foster is dead and the plaintiff in error and his wife are not competent to testify. It thus became necessary to determine the probabilities as to the true facts entirely from the surrounding circumstances.

The house of the plaintiff in error is located on the south-east corner of the block and faces east on Washington street, with a side entrance on the south to State street. The south line of the main part of the house is located nineteen feet north of the north line of the sidewalk on the north side of State street. The house is a story and a half in height, and to the west there extends an addition or "L." The south line of this west portion of the house is located twenty-five feet north of the north line of said sidewalk. The bed-room occupied by plaintiff in error and his wife was located on the second floor in the west end of this addition or "L." On the south side of this room there is a window, and there is also a window in the middle of the west end of the room. The bottom of each of these windows is about twelve or thirteen feet from the ground. All the evidence tends to show that the shots were fired from this room, the contention of defendant in error being that they were fired from the south window, while plaintiff in error contends they were fired from the west window. Immediately west of the Shepherd residence, and in the same block and about one hundred feet distant, is located the residence of Mrs. E. S. Jones.

The circumstances developed by the evidence which tend to support the theory of defendant in error, in addition to those mentioned above, are these: That the wife

of Ralph Foster was absent from the village on the night in question, and it was his invariable custom when his wife was away from home to spend the night at the home of his mother, and that one of the routes which could be taken from the store to his mother's home led over the sidewalk south of Homer Shepherd's residence; that the body was found with the feet upon the sidewalk south and a little east of the south window of plaintiff in error's bedroom, and that the death was caused from a wound inflicted by a bullet which had evidently penetrated the heart; that after the neighborhood had been aroused and a crowd had congregated about the Shepherd home, and after plaintiff in error knew whom he had killed, he stated to his father-in-law, Howell, immediately upon the arrival of the latter, "Dad, I have got my victim," or "Father, I have got a victim," or "Well, dad, I marked him this time," the statement varying as it was recounted by the several witnesses; that the following morning, upon being asked by R. E. Bowers, one of his neighbors, why he did it, plaintiff in error replied, "Well, he was standing looking in at the window at me," and when Bowers asked him how he shot him in the back while he was looking in at the window at him, that plaintiff in error replied, "He was stooping down, looking north;" that the deceased at the time he was killed wore no coat or vest but wore a white shirt; that there was a street light, consisting of a forty-candle-power incandescent light twenty feet from the ground, at the intersection of State and Washington streets, and another of like power in State street 286 feet west of the west line of Washington street, and that there was a coal oil lamp burning in the east window of the Jones residence, which threw a light partially over the yard west of the Shepherd house; that the shot which killed Foster was fired within five minutes before the street lights were extinguished, at eleven o'clock, and that the straw hat worn by Foster at the time of his death was found beside the

body. Witnesses for defendant in error also testified that on the night in question there was a board walk extending from the south porch of the Shepherd house to the brick sidewalk, and that Foster's body was found slightly west of the extended west line of this board walk, and that a day or two afterward this board walk was removed. While there was no evidence whatever as to the condition of the walk, this testimony was evidently offered to afford a basis for drawing the inference that the boards of this walk contained bullet holes, which would support the theory that the shots had been fired from the south window.

The circumstances shown by the evidence which tend to support the theory of plaintiff in error, in addition to those enumerated in the general statement of facts hereinbefore made, are, that previous to the time Ralph Foster was killed burglars were supposed to be in the vicinity of the Shepherd home; that one night, about a week previous, Mrs. Jones caused to be reported to the night watchman that she had seen men around her residence and that they had gone from there to the Shepherd residence and that she believed them to be burglars; that the night watchman spent the greater part of the remainder of that night upon the Shepherd premises keeping a lookout for burglars; that the next day he caused this information to be communicated to plaintiff in error, together with the further information that he would probably spend at least a portion of the next night on the premises of plaintiff in error; that at about the same time another near neighbor of plaintiff in error detected men peering into the windows of his residence in the night time; that the following day he detailed this circumstance to plaintiff in error as an explanation of why he was making a deposit in the bank; that there were three bullet holes in the screen of the west window of the bed-room was testified to by three witnesses, one of whom saw the holes there an hour after the killing and the other two saw the same holes in the screen be-

fore it was removed on the following morning; that the south window and the west window of that bed-room were of different sizes, the south window being narrower and shorter than the west window, so that the screens could not be interchanged; that there were powder marks around each of the three holes in the screen; that the deceased could not have been killed at the spot where his body was found, by shots fired from the west window; that the board walk in question had been removed and broken up two or three months prior to the time of the killing; that a few minutes before the shots were fired a lamp was burning in the front room of Ralph Foster's home and the front door was open, and that the same condition was found to exist shortly after Foster was killed; that the course taken by the bullet, together with the testimony of Dr. Hoover that the bullet did not strike any bones and was not deflected from its course, indicated that the shot could not have been fired under the circumstances claimed by defendant in error. The south window was twelve or thirteen feet from the ground, and the north line of the sidewalk was twenty-five feet from the south line of that part of the Shepherd residence. It is contended by plaintiff in error that if a shot was fired from some point inside the south window, so that the bullet would penetrate the body of a man of average height just above the shoulder-blade or scapula while he was standing in the center of the sidewalk, and the course of the bullet was not deflected, it would pass out of the body at a point considerably above the navel.

Dr. Hoover testified that he did not make a post mortem examination, but that the bullet was perfect and showed no signs of having struck any solid object, from which he inferred that it had passed through only muscular tissue and had not been deflected. Assuming that there was no deflection and that the bullet took a straight course from the point of entrance in the shoulder to the point where it was found, near the navel, he gave it as his opinion that

it passed through the lung and also through the right ventricle of the heart. In support of this theory he says he found that the nose had emitted bloody froth, which indicated that the lung had been punctured, and that there had been respiration after the wound was inflicted, and that the eyes were wide open and staring, which indicated a wound in the heart and an effort to respire afterwards. He testified further that if the bullet passed through that portion of the heart which in his judgment it must have passed through if it pursued a direct course from the point of entrance to where it was found beneath the skin, Foster would still have been able to walk or run at least a hundred feet after receiving the wound and before collapsing.

It was further shown on behalf of plaintiff in error by three witnesses, that after the report was made that burglars had been seen in the vicinity of the plaintiff in error's home Ralph Foster had proposed to them, severally, that they go with him, in the night time, to the home of plaintiff in error and by pretending to be burglars "scare the stuffing out of him," or "scare the water out of him." The place of these conversations was fixed at the Foster store, and with the exception of one conversation the witnesses each named others who were in the store at the time of the respective conversations. Defendant in error called these persons, and they either denied that they were in the store at the times indicated or that they heard any such conversation. It was also shown, as a result of tests made under conditions similar to those existing at the time Foster was killed,—in the night time, with the street lights burning and with a lamp burning in the east window of the Jones residence,—that men dressed as Foster was at the time he was killed could not be identified in the Shepherd yard nor their features distinguished from the west bed-room window, and that it was only possible to tell that they were human beings.

It further appeared from the testimony that immediately after the killing plaintiff in error raised an alarm and called for help. When one of his neighbors, E. V. Burwell, arrived, plaintiff in error requested him to phone uptown, stating that he thought he had a victim down there. After attempting to telephone from the Jones residence, as he had been requested, Burwell returned to the Shepherd residence, where he and other neighbors examined the body by the light of a lantern. Plaintiff in error, who was still in his bed-room, inquired who it was, and upon being informed that it was Ralph Foster, exclaimed, "Oh, my God!" began to cry and said it was his wife's cousin and best friend. It also appeared from the testimony of Bowers that during the conversation plaintiff in error had with him the next morning he pointed out the spot between the west end of the house and the walnut tree where he claimed Foster was when the shots were fired.

In order to contradict and impeach the witnesses who testified to the statements made by plaintiff in error to his father-in-law (Howell) upon his arrival at the Shepherd home immediately after the killing, Howell was placed upon the stand and testified that plaintiff in error had not made any of the statements attributed to him, but that he did, in fact, say, "My God, dad! To think Ralph was the victim!" This witness was then allowed to detail the whole of the conversation which he had with plaintiff in error on that occasion, which was, in substance, that in response to an inquiry as to how it had happened, plaintiff in error said that he shot Foster out of the west bed-room window thinking he was a burglar; that it was dark and he could not tell who Foster was; that his wife had awakened him and told him there was a man out there by the cob house,—a building which stood on the line between the Jones and Shepherd properties; that he tried to re-assure his wife and convince her she was mistaken, but she insisted that there was someone there, and he arose and looked out of the win-

dow but did not see anyone; that he listened and thought he could hear someone while he was attempting to look out of the north window; that he heard a noise as though someone had entered the house and was walking across the floor; that while he was still at this north window his wife snapped her fingers and attracted his attention to the west window; that he moved over there and was finally able to discern a form in the yard west of the house, just a little bit north of the west window and four or five feet west of the house, in the shadow of a small walnut tree which stood about twenty-one feet west of the house; that he then secured his revolver from under the mattress of the bed and fired it three times through the window screen, thinking he would scare the man away; that Foster ran to the south and he heard him groan, and that he (Shepherd) then got over out of the way of the window and laid down on the floor close to the wall of the room.

From this evidence it is apparent that the question whether the plaintiff in error was liable was a very close one, and under this state of the proof it was of the utmost importance that no error should intervene that would be prejudicial. If the plaintiff in error fired the fatal shot in good faith believing that it was necessary to prevent the commission of a burglary upon his residence he would not be liable, although it might afterwards turn out that the alleged attempt at burglary was a mere jest or an attempt to frighten him, if the circumstances were such that other reasonable men would have been alike mistaken as to the purposes of the deceased. The well established doctrine in the law of self-defense, that men, when threatened with danger, may in good faith act upon appearances and will not be held criminally liable for a mistake in the extent of danger, where, from all the facts and circumstances, it can be seen that other reasonable men would have believed that a resort to self-defense was necessary, is applicable to an act committed in defense of habitation as well as one

which is committed in defense of person. Where one manifestly intends or endeavors by violence or surprise to commit a felony, such as burglary, and is killed, or where one in a violent, riotous or tumultuous manner attempts to enter the habitation of another for the purpose of assaulting or offering personal violence to any person dwelling or being therein and is killed to prevent the contemplated offense, such killing will be justifiable under the law of self-defense; and so if one is committing acts in or about a dwelling which reasonably and in good faith are believed to manifest a felonious intent, a man having the right of defense as to such dwelling may resort to force to repel the attack or prevent the felony, and his act may be justified under the law of self-defense although it might afterwards turn out that no felony was, in fact, contemplated but the only design was to frighten the persons in such dwelling. (*Reins* v. *People,* 30 Ill. 256; *Greschia* v. *People,* 53 id. 295.) While these salutary principles of self-defense are firmly imbedded in the law of this State, it is equally well settled that a bare fear of any of these offenses, to prevent which the homicide is alleged to have been committed, is not sufficient to justify the act under the doctrine of self-defense. As declared by our legislature in section 148 of the Criminal Code and announced by numerous decisions of this court, the circumstances must be such as to excite the fears of a reasonable person and the act must be the result of such reasonable fears. Whether the killing of the deceased by plaintiff in error occurred under circumstances which justify the act under the doctrine of self-defense or proceeded from some other motive was a question of fact, to be determined by the jury, under proper instructions, from a consideration of the evidence.

The whole of defendant in error's case was predicated upon the theory that the deceased was on his way from his store to his mother's residence, where he expected to spend the night, at the time he was killed, and any proof

made which tended to bear upon that question is of vital importance. It was only upon that theory that any attempt was made by defendant in error to account for his presence at the place where his body was found. Defendant in error called Jacob· R. Drake as a witness in her behalf. Drake was employed in a bank in the village of Lovington, and on the evening of August 19 had called upon Ralph Foster at his store at about eight o'clock and remained there between five and ten minutes, and that was the last time he had seen him. The other proof had disclosed that after that time Foster had gone to various parts of the village and had thereafter returned to the vicinity of his store, where he was last seen at about half-past ten o'clock. After the witness Drake had testified to his visit with Foster about eight o'clock that evening he was asked, "Do you know where he was to stay that night?" This was objected to by counsel for plaintiff in error upon the ground that it called for a conclusion or for a conversation which would be incompetent, and counsel for plaintiff in error requested that it first be shown whether he had secured his information through a conversation. The court overruled the objection and declined to require any preliminary proof to be made and directed the witness to answer the question. Before the witness could answer, counsel propounded another question and proceeded to conduct a different line of examination for a time, and then, recurring to this subject, asked, "Now, if you know where Ralph Foster was going to spend that night I wish you would tell the jury where he had arranged to go or where he was going to spend the night." The same objections were made and overruled. The witness then started to respond, "I was told——," when an objection was interposed and sustained. Counsel for plaintiff in error then requested the court to instruct the witness that he should not state what he was told by someone, to which the court responded that he did not think anybody ought to instruct the witness

258 – 12

what to answer. The record then shows that the witness made the irrelevant and irresponsive answer, "Yes," whereupon he was asked where Foster was to stay that night. To this question counsel again interposed an objection unless it should first be disclosed that he derived his knowledge from sources other than a conversation. The objection was overruled and the witness was permitted to answer that Foster was to spend the night with his mother, and this, together with the testimony of Foster's mother as to his invariable custom when his wife was away from home, was the only evidence on this subject. On cross-examination it developed that all the witness knew about the question where Foster was to spend the night was what Foster had told him in the conversation he had with him at eight o'clock that evening. When this was developed counsel for plaintiff in error moved to exclude the testimony of the witness as to where Ralph Foster expected to spend the night, whereupon the counsel for defendant in error who had conducted the examination stated that he did not oppose that motion, and the testimony was stricken.

It frequently occurs in the trial of cases that irrelevant and incompetent testimony inadvertently creeps in, and the only remedy the party has is to have the court exclude it and to instruct the jury that they should not consider such excluded testimony. Ordinarily this is sufficient to protect the rights of the parties, but under the state of the proof in this case and the circumstances attending the giving of this testimony we are of the opinion that the refusal of the court to first require counsel for defendant in error to elicit from the witness the source of his information was of such a prejudicial character as to require a reversal of this judgment. It is true that when it finally developed that the witness had no information on the subject except what he testified Foster told him, the court struck this testimony from the record, and when the jury were being instructed told them, generally, not to consider any testimony

which had been stricken. Yet we are all aware of the frailties of the human mind, and we know that while that testimony was stricken from this record, the impression it made, bearing, as it did, upon one of the vital questions in the case, could not be obliterated from the minds of the jurors, and it is impossible to say that this circumstance did not influence the jury in arriving at their verdict. The fact that this testimony was apparently elicited by counsel for defendant in error with the full knowledge that it was incompetent and must therefore be stricken adds to the gravity of the situation. This case was hotly contested. Able counsel were employed on either side and this was the second time the case had been tried. There is every indication that the most careful and skillful preparation had been made on both sides for the trial. It is improbable that the witness Drake was called to the stand and interrogated on this subject without a full knowledge on the part of counsel for the defendant in error as to the subjects concerning which he would testify and the source of his information. The manner in which the questions were framed, the fact that counsel themselves refrained from making the preliminary examination suggested, the promptness with which they agreed that the testimony should be stricken, all indicate a knowledge of the situation. The whole circumstance leads one to the conclusion that it was the purpose of counsel to get this incompetent statement before the jury and to secure the benefit of the impression it would make, even though it must be immediately stricken from the record.

Counsel for defendant in error now insist that this testimony was competent as a part of the *res gestæ,* and cite authority to the effect that proof may be offered to show statements made by a deceased person at the time of his departure or starting upon a journey, in reference to his destination. This is the law, but in order to be considered as a part of the *res gestæ* the statement made must be im-

mediately connected with the act of departure. (*Chicago and Eastern Illinois Railroad Co.* v. *Chancellor,* 165 Ill. 438.) In this case the statement was made about eight o'clock in the evening whereas Ralph Foster did not finally leave his store until at least half-past ten o'clock, and in the meantime he was in various parts of the village of Lovington. The statement was not competent as a part of the *res gestæ.*

Homer Shepherd was called as a witness in his own behalf to contradict the testimony of the witnesses for defendant in error who testified to the declarations he had made to Howell immediately after the death of Foster. The court permitted him to deny having made the statements testified to by witnesses for defendant in error, but declined to allow him to detail the conversation between him and Howell upon the ground that it was a different conversation than that testified to by the witnesses for defendant in error. One of the witnesses for defendant in error testified that these statements were made by plaintiff in error while he was standing in the yard near the south porch of his home, while the others testified that they were made while plaintiff in error was standing on the porch just outside the south door. They all agree, however, that the statements were made immediately after the arrival of Howell and were the first words spoken to him. Plaintiff in error and Howell both testified that when Howell arrived plaintiff in error was sitting just inside the south door, upon the lower step of the stairway, and it was while sitting there that he made his first remark to Howell and that he remained there during the whole of the conversation. We are unable to see how it can be said that plaintiff in error was testifying to a different conversation than that testified to by witnesses for defendant in error. While the witnesses disagree as to the exact spot where plaintiff in error stood when the remarks were made which were attributed to him, they agree that it was in the conversa-

tion which ensued immediately upon the arrival of Howell. Defendant in error having sought to prove a statement by plaintiff in error, made after the death of Foster, which she deemed to have been against his interests, plaintiff in error was entitled not only to deny the making of such a statement, but was entitled to prove such other parts of the conversation as tended to explain or even destroy the admission. (*Chicago City Railway Co.* v. *Bundy*, 210 Ill. 39.) Plaintiff in error was not competent to testify generally, as his counsel contend, but he was competent to testify on this subject.

Immediately after the death of Ralph Foster an inquest was held over his body by the acting coroner of Moultrie county. The verdict of the coroner's jury was offered on the trial on behalf of plaintiff in error and admitted in evidence. That verdict was as follows: "In the matter of the inquisition on the body of Ralph M. Foster, deceased, held at Lovington, Illinois, on the 20th day of August, 1909, we, the undersigned jurors, sworn to inquire of the death of Ralph M. Foster, on oath do find that he came to his death by reason of a gunshot wound in the right shoulder and ranging downward through the heart. The said wound was caused from a bullet fired from a gun held in the hands of Homer Shepherd, who fired the shot thinking Ralph M. Foster was a burglar on watch while other burglars were trying to enter his home, and that said Homer Shepherd fired the shot in protection of his home and in our opinion was justified in the act." By the twenty-fourth instruction given on behalf of defendant in error the court instructed the jury as follows:

"Court instructs the jury that you should entirely disregard the following portion or part of the verdict of the coroner's jury which has been admitted to evidence, to-wit: 'Who fired the shot thinking Ralph M. Foster was a burglar on watch while other burglars were trying to enter his home, and that said Homer Shepherd fired said shot in

protection of his home and in our opinion was justified in the act.' And you are further instructed that it will be highly improper for you to consider the above and foregoing portion of the verdict of the coroner's jury."

The verdict of a coroner's jury in an inquest over a dead person is required by the statute to be sealed up and returned to the clerk of the circuit court, where it shall be filed and preserved. It thus becomes a public record of the county, and as such is competent evidence to be considered in another proceeding as tending to prove any matter properly before the coroner which appears on the face of the inquest. *United States Life Ins. Co.* v. *Vocke,* 129 Ill. 557.

It is contended by defendant in error that the part of the coroner's verdict excluded by this instruction was not a proper finding to be made, and that it was therefore properly excluded. By section 14 of the Coroners act it is made the duty of a coroner's jury to inquire how, in what manner and by whom or what the dead body came to its death, and to make up and sign a verdict and deliver the same to the coroner. The principal object of an inquest is to determine whether a crime has been committed. It is further by section 23 of the act made the duty of the coroner, if any person is implicated by the inquest as the unlawful slayer of the deceased or as an accessory thereto and is not in custody, to apprehend and commit to the county jail such person so implicated or cause him to be apprehended or committed, there to remain until discharged by due process of law. Under these provisions of the Coroners act the finding that "the said wound was caused from a bullet fired from a gun held in the hands of Homer Shepherd, who * * * in our opinion was justified in the act," was a necessary and proper part of the verdict. That Homer Shepherd fired the shot in the protection of his home, thinking the deceased was a burglar, was merely the finding of an evidentiary fact and might properly have been

stricken as surplusage. The instruction as given was too broad.

During the examination of the night watchman, C. P. Wolf, a witness called on behalf of plaintiff in error, the court addressed the following remark to counsel for plaintiff in error: "It is not permissible to manufacture anything in the case, either by the party himself or by someone else." Counsel excepted to this remark of the court and complains of this as error. The remark was purely voluntary and was not made as the result of any objection by opposite counsel. We are unable to find any justification for the remark, either in the examination of the witness Wolf or anywhere else in the record, and think it was unwarranted. Coming, as it did, from the trial judge, it undoubtedly had a tendency to prejudice the jury against plaintiff in error.

Plaintiff in error objects to the giving of instruction No. 20 on behalf of defendant in error. That instruction is as follows:

"The issues in this case as to whether or not the defendant was guilty of unlawful, willful and wanton conduct, as alleged in the declaration, or was guilty of recklessness or carelessness, as alleged therein, at the time he shot and killed the deceased, Ralph Foster, (if the defendant did so shoot and kill the said Foster,) or whether the defendant was justified in the firing of said shot or shots in consequence of which plaintiff's intestate died, are questions of fact to be determined exclusively by the jury, and the court expresses no opinion whatever in this instruction upon any question of fact."

The objection urged is, that this instruction directs the jury to determine the law for themselves on the question whether plaintiff in error was justified in firing the shot which killed the deceased. Standing alone and detached from the series this instruction is open to this criticism,

but when it is considered with the other instructions in the series we do not think it had any tendency to mislead the jury. By the other instructions the jury were fully instructed as to the circumstances under which the act of plaintiff in error would be justifiable, and they were expressly instructed to regard the instructions as a series.

It is also contended that the case of plaintiff in error was undoubtedly prejudiced by the manner in which counsel for defendant in error presented her case to the jury. Numerous excerpts from the argument of counsel are copied in the brief of plaintiff in error as being particularly improper and objectionable. These quotations consist mainly of impassioned and earnest appeals to the jury to consider what the life of the husband and father would have been worth to his wife and child had he not been killed by plaintiff in error. These circumstances were calculated to appeal to the sympathy of the jury, but they were facts in the case and we see no impropriety in calling attention to them in the argument. We do not think the privilege of counsel was abused to the prejudice of plaintiff in error.

Other assignments of error are urged, but we perceive no error aside from that pointed out and we do not deem it necessary to enter into a discussion of all the points that have been raised.

For the errors indicated the judgments of the Appellate and circuit courts are reversed and the cause is remanded to the circuit court for a new trial.

*Reversed and remanded.*

VICKERS and FARMER, JJ., dissenting:

Conceding the existence of errors pointed out in the foregoing opinion, none of them, in our opinion, are sufficient to justify a reversal of the judgment. The case has already been twice tried in the circuit court with the same

result. The judgment rendered upon the last verdict has been affirmed by the Appellate Court. The judgment is now reversed and the cause is sent back to the trial court for a third trial. This is a hardship that ought not to be imposed upon litigants where it can be avoided without approving a record containing substantial error. The ruling of the court in regard to the evidence of the witness Drake was correct in every respect. After a statement had been cunningly drawn from him by the attorneys which was inadmissible because based upon hearsay statements, the court immediately excluded the evidence, and, following this ruling, in the presence of the jury, with an instruction, advised the jury that all evidence that was stricken out should not be considered. This circumstance is given prominence in the majority opinion, and it is, in effect, held that the striking out of incompetent evidence and instructing the jury to disregard it will not cure the error in the admission of incompetent testimony. If such is to become the established practice it will be difficult to ever obtain a judgment that may not be set aside for an error of this character. The conduct of the attorneys in pressing the inquiry upon the witness Drake when they should have known that he could not answer without basing his reply upon statements made to him by the deceased is highly reprehensible and deserves the severest condemnation of courts, but it ought not to be visited with a reversal of a judgment in favor of an innocent and unoffending client and in spite of correct rulings by the trial court. The other errors pointed out in the majority opinion are equally unmeritorious.

In our opinion the judgment of the Appellate Court should be affirmed.