### Herman Mandelkow, Appellee, v. Louis Meyer et al., Appellants.

### Gen. No. 25,966.

1. APPEAL AND ERROR, § 1411*—*when verdict will not be disturbed on appeal.* A verdict of a jury based upon conflicting facts will not be disturbed by a court of review unless the verdict and judgment are clearly contrary to the weight of the evidence.

2. APPEAL AND ERROR, § 1411*—*when verdict is contrary to weight of evidence.* In an action for assault and battery and false imprisonment, where plaintiff's actions on the night in question were subject to a righteous suspicion that they were the authors of a "Black Hand" letter received by one of the defendants and when requested to halt by a posse lying in wait for such authors, fired on defendants who thereupon returned fire, a verdict for the plaintiff was held to be contrary to the overwhelming preponderance of the evidence.

3. ARREST, § 29*—*when individuals in posse may arrest without warrant.* One acting in a suspicious manner and who fires on a posse upon a request to halt may be arrested by any of the posse without a warrant.

4. ASSAULT AND BATTERY, § 7*—*when posse may meet force with force.* A posse lying in wait for a person suspected of crime is justified in meeting force with force and in repelling the shots of such person with such force as may be necessary.

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number,

Mandelkow v. Meyer, 219 Ill. App. 286.

Appeal from the Circuit Court of Cook county; the Hon. JESSE A. BALDWIN, Judge, presiding. Heard in this court at the March term, 1920. Reversed with a finding of fact. Opinion filed October 11, 1920.

RATHJE, LAWLOR & CONNOR, for appellants; C. H. SIPPEL, of counsel.

ROBERT A. MEIER, JR. and HARRY A. GOLDSMITH, for appellee.

MR. PRESIDING JUSTICE HOLDOM delivered the opinion of the court.

In an action in trespass for assault and battery and false imprisonment plaintiff had a verdict and judgment for $1,000, and defendants appeal.

It is argued for reversal that the verdict and judgment are contrary to the probative force of the evidence, and we see no reason to disagree with this contention. The case was unusual on its facts and the recital of the events on the night of the alleged assault by plaintiff and his companion on that eventful evening is contradictory, inconsistent, suspicious and unconvincing.

The material facts which we extract from the evidence are that defendant Louis Meyer lives on his farm about 4 miles west of Chicago Heights in Cook county and that there is a crossroad on one corner of it; that two of these roads are the Lincoln highway and Cicero avenue; that there are a church and schoolhouse and other buildings on the northwest corner and a cemetery on the northeast and Meyer's farmhouse and orchard extend up to each of the roads to the southeast; that on July 7, 1915, Louis Meyer received by mail a writing dated July 4, 1915, mailed in Chicago 2 days later, as follows:

"Juely 4, 1915
Beary $500
ond the Nord Wist
Connar
Black Hand.
Or you Life
12 Juley"

The defendants Louis and William Meyer consulted the sheriff of Cook county and showed him the letter for the purpose of getting protection of the officers of the law from the impending danger threatened by the letter. They were fearful of results because buildings in the vicinity of Chicago Heights had been blown up by so-called "Black Hands." Two visits were made to the sheriff, who, on account of the stress of other matters, was unable to furnish any officer for the night of July 12, but the sheriff advised Louis and William Meyer that they, together with some of their neighbors, arm themselves, organize a posse, select one of their number a leader, conceal themselves about the corners on the night of July 12 and apprehend the persons who might come there during that night in search of money and when captured to take them to the nearest magistrate. These directions were followed by the defendants and five other neighbors gathering at the place where the $500 was requested to be placed by the Black Hand letter on the night of July 12 with shotguns and a rifle after dark and concealed themselves from view. Four of them were stationed in the orchard near the corners, two in the orchard along the road about 250 feet south, two a little distance north of the corners and the other two in the church.

At about 2:30 a. m. on July 13, plaintiff and one W. J. Anker, both strangers to defendants, approached the scene riding in a light spring wagon. The wagon first stopped about 275 feet from the corners, then shortly it started again, moving slowly until it arrived

at the corners, where it stopped.   Thereupon plaintiff alighted from the wagon, crouched down in a low, stooping position and examined the southeast corner, which is the northeast corner of Meyer's farm.   He then walked about in a stooping position looking at the ground.   When he reached the spot where the grass was about one and one-half feet tall he moved about, parting the grass with his hands and looking downward.   After he had thus searched the corner he went to the southwest corner and examined that in a similar way.   From thence he walked to the northwest corner, on which there was grass in triangular shape lying between the two driveways of the two roads and a cut-off which connected them from a point about 10 feet north of their intersection to a point about 25 feet west thereof.   He seemed to pay particular attention to this place, parted the grass with his hands and walked about in a low, stooping position with his face towards the ground.   Across the cut-off was a place with some loose dirt.   When he arrived there he swept away the loose dirt with his hands.   When plaintiff was seemingly unable to find what he appeared to be looking for he went to the northeast corner and seemingly examined the ground in the same manner as before.   As plaintiff went from corner to corner the team swung around in a short circle, keeping him always near the left side of the wagon, and at the time he was on the northeast corner, the team was facing south.   During this time one of the defendants was stationed in the church without his shoes; he laid down his gun for the purpose of putting them on and in so doing made a little noise, which was heard by some of the defendants and evidently by plaintiff, as he immediately ran away and jumped on the wagon.   Thereupon the defendant Bereiter, who had been selected as the leader and was in the orchard about 30 feet from the wagon, called to plaintiff and his companion to halt, that they were under arrest.   Instead of halting plaintiff and his com-

panion fired several shots at Bereiter and drove away. In an attempt to compel plaintiff to stop several shots were fired in the air by some of the parties, to which plaintiff paid no heed. All the defendants and their companions got through the fence at this time and onto the road and pursued the wagon without overtaking it. Thereupon seven of the men, including three of defendants, got into an automobile and followed the wagon in which were plaintiff and his companion and overtook it about a mile and a quarter from the corners. When this posse got within 100 feet of the wagon they again called to plaintiff and Anker that they were under arrest. This was answered by two more shots being fired from the wagon. In an attempt to avoid being shot all the parties except the driver jumped out of the automobile and three shots—two from shotguns and one from a rifle—were fired in the direction of the wagon, which did not stop until it got stuck in the brush of a willow tree standing by the side of the road about 300 feet from where the last firing took place. When the posse got to the wagon plaintiff was standing beside the wagon and Anker was afterwards found a short distance away hiding in a cornfield. It was then discovered that Anker had a flesh wound on the right wrist. Plaintiff on the trial claimed that he was shot in the right arm and side and that one of the defendants told him to throw up his hands and come along and struck him and kicked him and threw him on the wagon and told him to drive back. The defendants took plaintiff and his companion Anker to Matteson, about 2 miles away, and the chief of police of Chicago Heights was telephoned, who, in response to the deputy sheriff, came and took plaintiff and Anker into custody and conveyed them to Chicago Heights and took them before one Lee Carrier, a county magistrate. They were held on a warrant issued by the magistrate upon complaint duly made, and on the same day were released on bail. Upon a preliminary hear-

ing by the magistrate they were held to the grand jury and subsequently indicted for extortion.

When plaintiff and Anker were brought back to the corners they first told defendants that they had stopped at the corners to find out which way the telephone wires ran. When told they did not have to get off the wagon for that purpose plaintiff said that he had gotten off to look for signs. Subsequently plaintiff and Anker told the chief of police at Chicago Heights and later at a preliminary hearing before the magistrate testified that Anker had left his home at South Holland on that night at 6 p. m. to go to a horse market at Monee; that he stopped at Thornton, about two and one-half miles from South Holland, where he met the plaintiff, who agreed to accompany him; that they left Thornton at 11 at night and instead of following the regular road from there to Monee they left that road at the northern part of Chicago Heights and followed the route around Meyer's corner because some one had told them that the regular road was out of repair and to take the route past the corner; that they first stopped a short distance east of the corner to rest their horses; that when they got to Meyer's corner, not being certain that it was the one on which they had to turn south, they stopped and plaintiff got off the wagon to read the cemetery signs, and when he got to the northwest corner, in front of the horses, defendants opened fire; that their horses then ran away; that they did not get any of the shots at the corners but got all their injuries while they were being pursued.

Upon the trial, of this case they denied all of the foregoing statements and denied that they had made any of them either before or at the hearing of the charge before the magistrate. They denied having stopped east of the corners or that plaintiff had alighted from the wagon at the corners and denied having stopped there at all. They further testified on the hearing of this case that Anker left South Holland

not before 10 p. m.; that when he arrived at Thornton he and plaintiff just happened to meet in a saloon without any previous arrangement and that plaintiff just happened to be out of employment and that without having met or associated with Anker before, and without having any interest in the horses or market, plain-tiff immediately agreed to accompany Anker to the horse market at Monee; that they left Thornton at 11 p. m. with a few bottles of beer and one of whisky and that instead of being told that the regular road was out of repair and directed to take the one they did, that Anker was well acquainted with Meyer's corner, knew and recognized it when they got to it, turned south on it and that after they had driven south about 8 rods, without having stopped or given the slightest indication of guilty conduct, defendants, without cause or reason, suddenly shot at them and their horses.

The evidence, without contradiction, discloses that Meyer's corner is not on any of the direct roads that run from Thornton to Monee; that the distance from Thornton to Monee over the regular Monee road is 15 miles, while the route taken by plaintiff and Anker on the night in question is 19½ miles; that there were other roads running from Thornton to Monee well known to Anker, all of which were shorter, more trav-eled, in better condition and easier to follow than the route chosen past Meyer's corner. Neither plaintiff nor Anker claimed that they had ever before taken the Meyer's corner route to Monee. Anker admitted that ever since he was 15 years old he had frequently gone from Thornton to Monee, and until the night in ques-tion had never taken the route past Meyer's corner, although several times he had driven horses from Monee past the corner to Thornton; the last time was about 1912. The only reason given by Anker on the trial for having taken the Meyer's corner route was, that it is "a much quicker road," while it appeared

from the testimony that that road was a bad one and very muddy in many places.

The material facts testified to by plaintiff and Anker were contradicted by all the defendants, as well as by nine other witnesses not defendants and not interested in the outcome of the suit.

It may be conceded as the settled law of this State that the verdict of a jury upon the facts where they are in conflict will not be lightly disturbed by a court of review unless the court is firmly of the opinion from such evidence that the verdict and judgment are clearly contrary to its weight.  This case most positively comes within the exception to the rule stated.  The verdict is manifestly contrary to and in the teeth of the overwhelming preponderance of the evidence.

Plaintiff and his companion in the escapade, Anker, gave contradictory accounts of the whole affair.  Their testimony was inconsistent in every material particular and was successfully refuted by the defendants and other credible witnesses.  The testimony of defendants and their witnesses is on every material point consistent and carries with it the impression of verity.

Plaintiff and his companion Anker acted upon the night in question in such a way as to convict them of being the authors and instigators of the so-called "Black Hand" letter received by the defendant Louis Meyer.  They were both at the scene of action at the place designated in the so-called Black Hand letter upon the night of the day therein stated.  It is impossible to believe that their presence there was simply a coincidence.  In the light of their actions such presence is unexplainable on any honest theory.  What was plaintiff doing in searching the ground in the place where the $500 was ordered by the Black Hand letter to be placed?  There were no telephone wires in the ground.  He could hardly have expected to find a sign-post on the ground, at which plaintiff was looking all of the time he was searching there.  Assuming that he

heard the noise of the putting down of the gun in the church, he might naturally suspect that there were persons around watching for him, and thereupon immediately ran away to the wagon, in which Anker was sitting, and when commanded to halt, drove away as fast as possible, firing shots in the direction of the voice which commanded him to halt. The posse proceeded to pursue plaintiff and Anker, first on foot and then in an automobile. Plaintiff shot at the automobile and its occupants as they sped along after them. Some shots were fired by the pursuing party in answer to the shots of plaintiff in an attempt to procure him to halt and surrender. Finally, through a mishap to the wagon, plaintiff and Anker were halted and the posse took charge of them and took them to Matteson, 2 miles away, and from there to Chicago Heights, where they were charged with the statutory crime of attempted extortion. On this charge they were held by the magistrate to the grand jury.

The verdict is clearly against the greater weight of the evidence, which evidence entitled defendants to a verdict in their favor. Plaintiff had no right to shoot at any one of the posse present when commanded to halt. His actions were subject to a righteous suspicion, and if he had been a good citizen and innocent of any offense it was his duty to stop and explain the situation, which he naturally would have done if he were innocent of any wrongdoing. In shooting in response to the request to halt plaintiff was guilty of a crime. For such crime any of the posse were authorized under the law to arrest him without a warrant. *Smith v. Donelly,* 66 Ill. 464; *Hitzelberger v. Kanter,* 181 Ill. App. 459.

The defendants were justified in meeting force with force and to repel the shots of plaintiff which endangered the lives of defendants and those with them with such force as might be necessary. *Foster v. Shepherd,* 258 Ill. 164.

We do not consider it necessary to notice in this opinion any of the other errors assigned upon the record.

As the verdict and judgment are clearly contrary to the probative force of the evidence, the judgment of the circuit court is reversed with a finding of fact.

*Reversed with a finding of fact.*

DEVER and McSURELY, JJ., concur.

Finding of fact. The court finds as an ultimate fact that the defendants are not, nor is any one of them, guilty of any of the trespasses charged in plaintiff's declaration or any count thereof.