People of the State of Illinois, Plaintiff-Appellee, v. Morris Fiddler, Defendant-Appellant.

Gen. No. 52,990.

First District, Second Division.

November 19, 1968.

Rehearing denied December 16, 1968.

319

Harry J. Busch and Jacob Shamberg, of Chicago, for appellant.

John J. Stamos, State's Attorney of Cook County (Elmer C. Kissane and John M. Goldberg, Assistant State's Attorneys, of counsel), for appellee.

MR. PRESIDING JUSTICE BURKE delivered the opinion of the court.

Defendant was charged under a two-count indictment with the strangulation murder of Jayne Levin. He was found guilty by a jury and sentenced to a term of twenty to thirty years in the penitentiary. He appeals.

On the date of her death, Jayne Levin was sixteen years of age and attended high school in Chicago. She and defendant, aged seventeen, had "gone steady" for several years.

Raymond Cunningham, the owner and operator of a garage located in the 4500 block of North Elston Avenue in Chicago, testified that about 5:30 p. m. on June 3, 1966, he was in the office of the garage when defendant entered the garage from the alley entrance and requested permission to use one of the washrooms. Cunningham stated that defendant was holding his stomach and complaining that he was sick. Defendant spent three minutes inside the washroom, during which time he made sounds as if ill. Defendant thereafter left the building by way of the same alley ·exit, but returned several minutes later in an agitated, excited state. He requested Cunningham to accompany him to the alley because he thought "someone has murdered my girl friend, she is turning blue." Cunningham testified that he told defendant he was un-

able to leave the office, but that he would notify the police. Defendant again left the building by the alley exit, and a customer entered the garage office and engaged Cunningham in conversation. Defendant returned a third time, five or six minutes later, and requested Cunningham to go into the alley and check his girl friend's pulse. At this time the police and fire ambulance were summoned.

Approximately 5:45 p. m. on the date in question Chicago Firemen Foley and Thomas, assigned to a fire department ambulance, received a call to proceed to the vicinity of Elston and Kennicott Avenues in the city. Upon their arrival at the scene, they observed defendant at the mouth of an alley 100 feet from the intersection of Elston and Kennicott Avenues. Defendant appeared to be "highly agitated" and stated to the firemen that his girl friend was "sick" in his parked automobile several hundred feet into the alley. Fireman Thomas testified that defendant ran in front of the ambulance as it proceeded into the alley toward the parked automobile, shouting "come on, hurry up, hurry up, down by the parked car." Police Officer Liszkowski, one of the police officers summoned to the scene, testified that defendant was running back and forth between the ambulance and the squad car which had entered the alley behind the ambulance, shouting "something happened to his girl friend in the car, that he thought she was dead." Officer Wirkus' testimony was much the same as that of his partner, Officer Liszkowski, except that Officer Wirkus did not testify that he heard defendant shout that he thought Miss Levin was dead. Defendant's emotional state at this time was described by the witnesses as "hysterical," "agitated," "highly nervous," and the like.

The firemen and the policemen testified they looked into the parked automobile and observed Miss Levin's body in the front of the automobile on the passenger's side. The body was in a kneeling position on the floor,

with the head face downward on the seat. As the body was being removed from the automobile onto a stretcher, Officer Wirkus noticed a handkerchief stuffed into its mouth. Fireman Thomas testified that he removed the handkerchief and that he asked defendant, "Who did this?" to which defendant replied, "I did." While Officer Wirkus stated he did not overhear any conversation between defendant and the others at the scene, Fireman Foley testified that Fireman Thomas had no conversation with the defendant other than to ask him who stuffed the handkerchief into the deceased's mouth, to which defendant replied, "I did."

Miss Levin's body was removed to Forkosh Hospital where a staff physician made an examination. An attempt was made to resuscitate Miss Levin for thirty minutes, but to no avail. The doctor testified that he was unable to say exactly when death occurred. He stated that he observed linear marks or abrasions moving in a circular pattern around the deceased's neck, apparently caused by some form of friction; this testimony was corroborated by a police technician and also by Fireman Foley. The physician was unable to state an opinion as to the cause of the marks and gave no opinion as to the cause of death.

Several police technicians ran various tests on the body of Miss Levin, her clothing, defendant's clothing, and the automobile from which the body was removed. Although there was no sign of sexual molestation and no apparent damage to clothing of recent origin, the deceased's knees and ankles were scraped and lacerated.

Doctor Reese Guttman, a specialist in diseases and disorders of the head area, testified that, in his opinion, ligature strangulation could not have been caused by the handkerchief found in the mouth of Miss Levin.

The only direct evidence of the cause of Miss Levin's death is a certified copy of the coroner's certificate of death issued by the county clerk. It appears from the

323

record that the coroner's physician who performed the autopsy, Dr. Henry, was deceased at the time of trial. Over strenuous objection by the defense, the trial court allowed the certified copy into evidence on the ground that the Vital Statistics Act permits the introduction of such documents into evidence as prima facie evidence of the facts contained thereon. The document was admitted for the limited purpose of showing the cause of Miss Levin's death to be ligature strangulation.

Defendant first maintains that it was error to have admitted the certified copy of the coroner's certificate of death into evidence for the reasons that the coroner's certificate, as a statement of the cause of death, is not based upon the coroner's own medical examination and is therefore hearsay; that the county clerk's certified copy of the coroner's certificate is also hearsay as to the cause of death; and that neither document is given evidentiary status by statute.

■ Except as authorized by the Act, disclosure of information contained in vital statistics records by the party in custody of those records is prohibited by the Vital Statistics Act. Ill Rev Stats 1967, c 111½, par 73–24. Section 25 of the Act generally designates those parties entitled to disclosure of such information. Ill Rev Stats 1967, c 111½, par 73–25.

Subsections 1, 2 & 3 of section 25 set out the requirements for obtaining a certification of birth or death. The certification shall disclose only the name, sex, date and place of birth or death of the subject party, and the registration number. It is specifically provided that none of the other data appearing in the vital statistics records shall be included in the certification, with one exception not relevant here.

Subsection 4 of section 25, on the other hand, deals with a certified copy of a certificate of birth or death and provides that such certified copy shall be issued:

"(a) Upon the order of a court of record; or

". . .

"(c) Upon specific written request by a department of the state or a municipal corporation or the federal government; or

"(d) In case of a death . . . certificate, upon specific written request of a person, or his duly authorized agent, having a personal or property right interest in the record."

Subsection 6 of section 25 provides that "[a]ny certification or certified copy of a certificate issued in accordance with this section shall be considered as prima facie evidence of the facts therein stated, . . ."

A consideration of section 25 as a whole reveals that the legislature has drawn a distinction between a "certification" of a vital statistics record and a "certified copy of a certificate." "Certification" is defined as the "[a]ct of certifying, or state of being certified; attestation." (Webster's New International Unabridged Dictionary, 2nd Ed.) The Vital Statistics Act specifically limits the matters which the county clerk may include in a certification, namely, the sex, name, place and date of birth or death of the subject party, and the registration number. A "certified copy," on the other hand, is defined as "[a] copy of a document or record, signed and certified as a true copy by the officer to whose custody the original is intrusted." (Black's Law Dictionary, 4th Ed, 1951, p 287.) Subsection 4 of section 25 provides that a "true copy" of a birth or death certificate may be issued to any of those parties therein named, without regard to the nature of the data appearing on the copy.

 Prior to the enactment of the Vital Statistics Act in 1961, and until the year 1925, a coroner's certificate of death was admissible to show the fact and the cause of

death in civil cases. See e. g., Foster v. Shepherd, 258 Ill 164, 101 NE 411. All cases supporting this view, however, were expressly overturned in 1925 when it was held that those matters contained on the certificate of death were inadmissible as evidence of the cause of death. Spiegel's House Furnishing Co. v. Industrial Commission, 288 Ill 422, 123 NE 606; Plano Foundry Co. v. Industrial Commission, 356 Ill 186, 190 NE 255. While the issuance of both certifications and certified copies were controlled by section 55 of chapter 111½ of the Illinois Revised Statutes prior to 1961, only the information contained on a certification was made admissible as prima facie evidence of such matters. See Ill Rev Stats 1959, c 111½, par 55. The information contained on a certified copy of a certificate, on the other hand, was presumably controlled by the case law as set out above concerning a coroner's certificate of death. All of the foregoing was obviated by passage of the Vital Statistics Act in 1961, which expressly provides that the information contained both on certifications of death and on certified copies of a coroner's death certificate constitutes prima facie evidence of such matters. Consequently, defendant's position, that the matters contained on the coroner's certificate of death and on the county clerk's certified copy thereof are merely hearsay and therefore inadmissible, is without foundation.

Defendant, however, maintains that the terms "certification of death" and "certified copy of a certificate" are used interchangeably throughout section 25 of the Vital Statistics Act, so that the sole data contained in the vital statistics records which the county clerk may divulge is the name, sex, date and place of death of the subject party, and the registration number. Defendant concludes that the cause of death appearing on the certified copy of Miss Levin's death certificate was surplusage and therefore inadmissible as evidence since the Act does not give

the county clerk the authority to divulge such information.

█ The statutory history of certificates of death and of certified copies of death certificates discloses a distinction consistently drawn between the two types of documents. Prior to the passage of the Vital Statistics Act, certifications of death were dealt with apart from certified copies of death certificates, and all matters contained thereon were given the status of prima facie evidence. Ill Rev Stats 1959, c 111½, par 55. Although dealt with in the same section as certifications of death, prior to 1961, certified copies of death certificates received no such evidentiary status by the statute, but, rather, the evidentiary status of certified copies was governed by case law, as noted above. Under the Vital Statistics Act of 1961, certifications of death are dealt with in subsection 3 of section 25 of the Act and rules are set down as to what shall be contained thereon. Certified copies of certificates, however, are specifically dealt with in subsection 4 of section 25. Subsections 5, 6, and 7 of section 25 then continue this distinction between the two types of documents, referring to them as "[a]ny certification or certified copy" of a certificate. Although subsection 11 of section 25 refers to "an original, certified copy, or certification of a certificate" in prohibiting custodians of vital statistics records from preparing or issuing any "certificate" other than as authorized by the Act, it appears that this is no more than inexact wording rather than the employment of the terms interchangeably as defendant suggests. Consequently, while a certification of death may contain only the name, sex, date and place of death of the subject party, and the registration number, a certified copy of a death certificate must, by its very nature, contain all information contained on the certificate itself, which, by statute, must contain the cause of death. See Ill Rev Stats 1967, c 31, pars 10.1, 10.4.

The trial court did not commit error in admitting into evidence the certified copy of the coroner's death certificate as prima facie evidence for the limited purpose of showing the cause of Miss Levin's death.

Defendant next maintains that the trial court failed to strictly construe the Vital Statistics Act, which is in derogation of the common law, in that the provision in subsection 6 of section 25, allowing certifications and certified copies to stand as prima facie evidence of the matters contained thereon, was permitted to encompass the disclosure information not permitted by subsection 3, namely the cause of death. This argument is again premised upon the erroneous theory that both certifications and certified copies of death certificates are treated equally and interchangeably in the Act. Nor can it be heard that the admission into evidence of the certified copy, containing information concerning the cause of death whereas it appears that the coroner's physician who reported the cause of death is unavailable to testify, violates defendant's constitutional right to confront the witnesses against him. See People v. Love, 310 Ill 558, 142 NE 204; People v. Dolgin, 415 Ill 434, 450, 114 NE2d 389.

Defendant's final contention is that the trial court committed error in overruling his post-trial motions inasmuch as there was no competent evidence of the cause of Miss Levin's death, nor any evidence that defendant was the agency which caused her death. We disagree.

The certified copy of the coroner's death certificate introduced into evidence shows the cause of Miss Levin's death as ligature strangulation. The physician who examined the body upon its arrival at Forkosh Hospital, a police technician, and Fireman Thomas testified to linear marks going around Miss Levin's neck, which the physician testified were caused by some form of friction and which generally corroborates the ligature

strangulation information contained on the certified copy of the death certificate. There is also evidence that defendant was in a highly excited and agitated state when requesting the aid of witness Cunningham and also when the police and firemen arrived at the scene. Cunningham testified that defendant stated he thought "someone has murdered my girl friend, she is turning blue." The handkerchief found stuffed into the deceased's mouth was placed there by defendant, Firemen Thomas and Foran testifying that, when asked who placed the handkerchief into the mouth, defendant replied, "I did." (The fact that a doctor testified that the handkerchief found in the deceased's mouth could not have caused the ligature strangulation is immaterial, since it does not appear that the State's case was based on the theory that the death of Miss Levin was the result of the handkerchief stuffed into her mouth.) The body was found in the front seat of defendant's automobile, which was parked several hundred feet into the alley. We find that there was competent evidence of the cause of Miss Levin's death and conclude that from the evidence presented, the jury could reasonably have inferred that defendant caused her death.

For these reasons the judgment is affirmed.

Judgment affirmed.

McNAMARA and LYONS, JJ., concur.